808 P.2d 31

**Annie N. GARCIA, Plaintiff–Appellant,**

v.

**Sheilah P. GARCIA, individually and as Personal Representative of the Estate of Julian N. Garcia, Defendant–Appellee.**

**IMPORTS LIMITED, INC., New Mexico Corporation, Plaintiff-in-Intervention,**

v.

**Annie N. GARCIA and Rio Grande Development Co., a Joint Venture, Defendants-in-Intervention.**

No. 18616.

Supreme Court of New Mexico.

March 4, 1991.

Rehearing Denied April 5, 1991.

---

Hooker & Sedillo, Thomas F. Hooker, Jr., Albuquerque, for plaintiff-appellant.

Poole Law Firm, Jason Kent, Albuquerque, for defendant-appellee.

## OPINION

MONTGOMERY, Justice.

The parties agree in their briefs that this case can be correctly characterized as a "posthumous land-grab." They disagree, of course, on who is doing the grabbing. We do not resolve this question, but we hold that the trial court permissibly decided that the plaintiff's suit to quiet title was barred by her laches. In so holding, we consider the following issues raised by the plaintiff on appeal: Whether the court's ruling improperly deprived the plaintiff of her right to a jury trial; whether the defendant's defense of laches was good against plaintiff's suit to quiet title, even though her statute of limitations defense was not; and whether the defendant satisfactorily established each of the elements of laches in this case. We affirm the trial court's judgment.

### I.

The dispute originated with a real estate contract executed in October 1967. The plaintiff-appellant, Annie N. Garcia, contracted to buy a tract of land in Albuquerque, New Mexico, from her son, Julian (who was then a successful automobile dealer and is now deceased) and his wife, defendant-appellee Sheilah B. Garcia.[1] The tract subject to the contract consisted of

1. In this opinion we shall refer to the Garcias, as the parties do in their briefs, by their first names.

three lots acquired by Julian and Sheilah during the early and mid–1960's. One of the lots was improved with a building, which in 1967 housed Julian's Toyota and Honda business and since 1982 has housed the Rio Grande Cantina Restaurant.[2] An unusual feature of the contract was that it did "not include improvements" and so did not include the building.

A key issue in the eventual litigation between Annie and Sheilah (this case) was whether or not the 1967 contract was a sham. The trial court did not ultimately decide this issue.[3] However, in its findings of fact it determined that the contract had been executed in furtherance of a tax avoidance scheme, conceived by Julian, under which the proceeds received by Annie and her late husband, Toby, from the condemnation of some nearby property would be reinvested through the purchase from Julian and Sheilah of the three lots now known as the Cantina property.

Contemporaneously with execution of the real estate contract, Annie executed a fifteen-year lease of the Cantina property and also of two adjoining lots, which had long been owned by Annie and (until his death in early 1967) Toby.[4] The lessee under the long-term lease was Imports Limited, Inc. (Imports), a corporation wholly owned by Julian and Sheilah. As to the Cantina property, then, the transaction was a sale and leaseback, under which Julian and Sheilah sold the property to Annie, who leased it back to a corporation owned by Julian and Sheilah.

The purchase price under the contract was largely deferred, and the deferred balance was payable in installments of $300 per month. Under the long-term lease, Annie received rent of $600 per month, so she netted $300 per month after making the $300 monthly installment payment to Julian and Sheilah.

The real estate contract was not recorded until two and one-half years after its execution. The portion of the printed-form contract calling for an escrow was not completed, and no deeds were placed in escrow. The long-term lease was misplaced and forgotten; it was not discovered until after Julian's death in October 1984. As developed at trial, Annie believed until that time that the rental payments of $600 per month related to the Parking Lot, not the Cantina property.

During the seventeen years between execution of the contract and Julian's death, the parties, at least outwardly, manifested the understanding that Julian and Sheilah continued to own the Cantina property. An income-tax audit on Annie and Toby took place in early 1970, and the contract was recorded at that time. About a year after completion of this audit, Julian told Annie to discontinue her payments under the contract, stating that it was "all paid." At that time Annie had made thirty of the 135 installments payments called for by the contract. Sometime thereafter, property taxes on all of the property became delinquent, and the different parcels had to be repurchased from the state. Julian attended to these delinquent payments and caused the tax deed to the Parking Lot to be issued in Annie's name and that to the Cantina property in his and Sheilah's names. In 1982, Julian and Sheilah leased the Cantina property to a Mr. Walker, who commenced operating the restaurant in the building.

As noted, Julian died in the fall of 1984. Thereafter, relations between Annie and Sheilah deteriorated. In March 1986, Annie demanded, through an attorney, an increase in the rent on the Parking Lot to $2,000 per month. Sheilah demurred and discontinued her use of the Parking Lot.

---

**2.** The tract purchased by Annie under the 1967 contract—the three lots—is referred to in the briefs as "the Cantina property."

**3.** The court, in fact, was not authorized to decide the issue on its own, even after it granted a new trial, as this was an issue which both parties agreed was to be submitted to the jury. *See* Part II of this opinion.

**4.** The two adjoining lots are called the "Parking Lot." The lease is referred to in the briefs as the "long-term lease." The lease expired by its terms in 1982, but it granted the lessee options to renew until 2012.

Annie then commenced this action in March 1987.

Her complaint consisted of four counts. Count I sought a declaratory judgment that the real estate contract was valid and enforceable and a decree of specific performance of the contract. Count II requested that her title to the Cantina property be quieted as against Sheilah and anyone claiming under her. Count III sought an accounting for, and recovery of, rentals received by Sheilah from the operation of the restaurant, and Count IV prayed for damages resulting from Sheilah's alleged slander of Annie's title.[5] Sheilah filed an answer and counterclaim, raising various defenses, including "waiver, latches [sic] and estoppel," and requesting a declaration that the contract was not intended as a true sale and that title to the property be quieted in her.

The pleadings were completed with a complaint in intervention by Imports against Annie and Rio Grande Development Co., a joint venture in which she was involved for the development of the Parking Lot; an answer in intervention and a counterclaim against Sheilah and Imports; and a reply by Sheilah and Imports to this counterclaim. These pleadings placed in issue the continued effectiveness of the long-term lease until 2012, Sheilah and Imports asserting that if the real estate contract was in effect, then so was the long-term lease and Sheilah and Imports were still entitled to possession of the Parking Lot under it. Annie and Rio Grande claimed that the lease had expired in 1982 and that the options to renew until 2012 had not been effectively exercised.[6] While the pleadings were being filed, Sheilah timely demanded a trial by jury "on all triable issues in this case including all such issues raised by" the various pleadings.

After voluminous discovery and other pretrial proceedings, the case came on for trial before a jury. On the second day of trial and after Annie had rested her case in chief, Sheilah moved for a directed verdict on various grounds and also for dismissal on the ground of laches. With respect to the latter motion, her counsel said:

> [T]his is a motion for dismissal, not a motion for directed verdict. It is addressed to the Court sitting in equity, and as the Court * * * has already considered, this is an unusual case in the sense it involves equitable issues. The equitable issue this motion raises is latches [sic] * * * * [I]t is a matter of equity and not a matter of law as is limitation[s].

There was no comment from either the court or Annie's counsel at this point. Specifically, Annie made no objection to Sheilah's point that her motion on laches could be treated differently than the motions for a directed verdict and that the laches motion was based on facts which should be decided by the court, not the jury.

The court reserved ruling on most of Sheilah's motions [7] and requested from the defense a memorandum outlining her various motions. In her memorandum, Sheilah again made it clear that her motion on laches was a motion to dismiss addressed to the court sitting in equity. At no point in the trial did Annie object that this issue, even if equitable, should be submitted to the jury. In fact, at one point later in the trial Annie's counsel told the court that the equitable question of who has the better title in a quiet title dispute should be decided by the court, not the jury.

---

5. The district court granted a directed verdict to Sheilah on the slander of title claim, and its action in doing so is not raised as an issue on this appeal.

6. The trial court resolved this issue in favor of Annie and Rio Grande, awarding them a directed verdict on the issue of the effectiveness of the lease and holding that it had expired by its terms in 1982. The trial court's action in so holding is not challenged on this appeal, except

that Sheilah seeks review of it in the event the judgment in her favor with respect to the Cantina property is reversed. Since we affirm that judgment, we do not reach any issue raised by the pleadings in intervention concerning the long-term lease.

7. The court granted the motion addressed to Annie's claim for slander of title. *See supra* note 4.

The trial continued. The primary issue, which both parties and the court recognized was for decision ultimately by the jury, was whether or not the real estate contract had been a sham. On the fifth day, after both sides had rested but before Annie had completed her rebuttal case, Annie's counsel moved for a mistrial, complaining that the judge's gestures made counsel "look bad in front of the jury." The court granted a mistrial, following which Sheilah renewed her motions for a directed verdict and to dismiss. The court granted a directed verdict on the ground that Annie's complaint was barred by the statute of limitations and a dismissal on the ground of laches. The court then entered written findings of fact and conclusions of law in Sheilah's favor, finding Annie guilty of laches, and a judgment dismissing the complaint with prejudice and quieting title to the Cantina property in Sheilah.

On appeal, Annie attacks the court's rulings on applicability of the statute of limitations and laches, as well as certain other rulings in Sheilah's favor which need not be reviewed here in light of our disposition of the laches issue.[8] Her attack is premised essentially on two theories: First, that under the standard of review applicable to directed verdicts the court erred in finding any facts, drawing any inferences from the disputed evidence, and otherwise resolving any factual issues in Sheilah's favor; second, that in any event the court's findings are not supported by substantial evidence. The first of these theories raises the question—although Annie does not frame it in precisely this way—whether the court properly took the case away from the jury in dismissing Annie's complaint on the ground of laches. We shall deal first with this question.

## II.

As noted, Annie frames this issue solely as if the trial court had granted a directed verdict to Sheilah under SCRA 1986, 1–050, on Sheilah's defense of laches. Were that the case, Annie would be correct that the trial court's action would be reviewable under the rules set out in cases like *Skyhook Corp. v. Jasper*, 90 N.M. 143, 146, 560 P.2d 934, 937 (1977), that the reviewing court reviews the evidence and the reasonable inferences therefrom in the light most favorable to the party resisting the motion and resolves conflicts or contradictions in the evidence in favor of that party. Sheilah, however, argues that her motion on laches was not a motion for a directed verdict at all, but rather a motion to dismiss under SCRA 1986, 1–041(B), the pertinent portion of which provides:

> After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 1–052.[9]

Sheilah maintains that the trial court properly determined the facts in conformity with this rule and rendered judgment in her favor, making the required findings under Rule 1–052 and dismissing Annie's complaint on the ground that upon the facts as determined by the court and the law surrounding laches Annie had shown no right to relief.

Annie responds that this was not "an action tried by the court without a jury," and that the court's ruling had the effect of depriving her of her right to a jury trial on the facts surrounding the laches issue.

---

**8.** Annie also asserts error in the trial court's denial of her own motions for a directed verdict on various grounds. Again, in light of our disposition of the laches point, it is not necessary to reach any of the issues underlying Annie's motions for a directed verdict.

**9.** The rule has been amended effective January 1, 1990, but the only changes to the quoted portion are to make it gender neutral. *See* SCRA 1986, 1–041(B) (Cum.Supp.1990).

While Annie does not develop it this way, her argument can be framed as asserting either or both of the following propositions: (1) That the case involved both legal and equitable issues, the facts surrounding which were so intertwined that the court was bound, in order to protect Annie's right to a jury trial on the legal issues, also to submit to the jury the facts concerning the intertwined equitable defenses. (2) That under SCRA 1986, 1–039(B), the court had ordered a trial with a jury whose verdict was to have the same effect as if a trial by jury had been a matter of right; the court's action in taking the laches issue away from the jury deprived Annie of the right to a jury verdict on laches and vitiated the conclusive effect given to a jury verdict under this rule.

The first of these propositions would make for an interesting issue on this appeal—one that might help clarify the rather confusing state of the law in New Mexico on the question of a party's entitlement to a jury trial in a case involving both legal and equitable issues. *Compare State ex rel. McAdams v. District Court*, 105 N.M. 95, 97, 728 P.2d 1364, 1366 (1986) (when legal and equitable issues are joined in lawsuit, trial court should first decide equitable issues; then any remaining independent legal issues may be tried to jury) *with Evans Financial Corp. v. Strasser*, 99 N.M. 788, 790, 664 P.2d 986, 988 (1983) (only under most imperative circumstances can right to jury trial of legal issues be lost through prior determination of equitable claims). *See also Peay v. Ortega*, 101 N.M. 564, 565, 686 P.2d 254, 255 (1984) (trial court determines equitable issues but parties are entitled to jury trial of legal issues); *Scott v. Woods*, 105 N.M. 177, 184, 730 P.2d 480, 487 (Ct.App.) (joining legal and equitable claims gives plaintiff right to have common issues of fact decided by jury and can provide right to have legal claims tried first), *cert. quashed*, 105 N.M. 26, 727 P.2d 1341 (1986).

Annie cites none of these cases and does not otherwise attempt to shed light on whether the facts underlying Sheilah's laches defense should be regarded as "incidental" to the legal issues in the case, or at least to issues that the parties and the court had committed to submit to the jury, or should be regarded as "independent" of those issues, or should be regarded in some other relevant light. Under these circumstances, we have no wish to become embroiled in discussing an issue that has not been adequately briefed by the parties. *See Petritsis v. Simpier*, 82 N.M. 4, 474 P.2d 490 (1970).

As to the second of her two implied propositions, we first note the provisions of Rule 1–039(B):

In all actions not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury; or the court, with the consent of both parties, may order a trial with a jury whose verdict has the same effect as if a trial by jury had been a matter of right.

Assuming that the laches issue was not triable of right by the jury, it is possible that both parties had consented and that the trial court in effect had ordered that the issue be tried by the jury. If that were the situation, then our holding in *Peay v. Ortega* might well be applicable:

[Under Rule 39(B)] once the parties consent to try an issue to a jury and the court orders a jury trial pursuant to the stipulation, the trial court cannot withdraw the legal issues from the jury on the ground that there are also equitable issues involved.

101 N.M. at 565, 686 P.2d at 255.

Again, Annie does not spell out any such argument in her briefs, and so we are bereft of the parties' views on this question. We are loathe to reach a conclusion the effect of which is to deprive a party—in this case Annie—of her right to a jury trial on an issue that the parties and the court had stipulated should be tried by the jury. However, we have concluded that no such problem arises in this case because Rule 39(B) did not apply to the issue as it arose during the trial.

Although the parties and the court proceeded to empanel a jury and apparently intended at the outset to submit the entire

case to the jury, there was never a stipulation that the laches issue—or any other issue for that matter—would be tried by the jury. Nor did the court order a jury trial of any particular issue (or otherwise enter a pretrial order under Rule 16, as is certainly desirable in cases like this). The court might have intended all along to use the jury in an advisory capacity with respect to its determination of the equitable issue of laches. While one might suspect that Sheilah, at least initially, had consented to a jury trial of the laches issue, her motion for dismissal at the close of Annie's case in chief and her explicit casting of the laches issue as an equitable issue for decision by the court, without objection by Annie, make it clear that the parties never expressly or impliedly consented to a jury trial of the issue.

We hold that Rule 39(B) was not applicable to the laches issue as it developed at trial and that it was proper for the trial court to decide the issue when Sheilah, following the court's declaration of a mistrial, renewed her motion to dismiss under Rule 41(B).

### III.

In considering Annie's contention that the trial court erred in granting Sheilah's motions for a directed verdict based on the statute of limitations and for dismissal based on laches, it is helpful to distinguish between the two defenses as invoked by Sheilah in this case. The particular statute of limitations she raised was NMSA 1978, Section 37-1-3 (Repl.Pamp.1990),[10] which provides that an action founded on a written contract must be brought within six years from the time the cause of action accrues. Defending her directed verdict on this issue, Sheilah argues that Annie's cause of action for specific performance of the real estate contract accrued in 1971, when Julian told her that she should not make further payments and that the contract was "all paid." Annie contended at trial that this constituted full performance

of the contract, entitling her to the deed promised by the contract; if so, counters Sheilah, Annie's cause of action to obtain the deed accrued at that time and her suit for specific performance, not brought until 1987, was barred by the statute.

Annie responds that she presented to the jury sufficient evidence of Julian and Sheilah's "fraudulent concealment" and "constructive fraud" which, if believed by the jury, would have justified it in not applying the statute of limitations. Annie also responds that, in any event, the statute of limitations is not applicable to her claim that title to the property should be quieted in her name—the statute of limitations does not bar a suit to quiet title.

Without passing upon the validity or applicability of Annie's claimed exceptions to the statute of limitations for fraudulent concealment or constructive fraud, and without passing upon the correctness of the trial court's taking these issues away from the jury, we agree with Annie that her claim to a quiet title decree was not barred by the six-year statute of limitations on written contracts. Sheilah characterizes the essence of Annie's suit as a suit for specific performance: If Annie was not entitled to specific performance of the contract, then, says Sheilah, she was entitled to no relief at all. We think this position overstates the significance of Annie's claim to specific performance and unduly elevates the statute of limitations defense as an absolute bar to a real estate contract vendee's claim of title.

Under Section 37-1-3, an action founded upon a contract in writing must be brought within six years after the cause of action accrues. If we assume with Sheilah that Annie's cause of action accrued in 1971, then an action to enforce the contract—whether by way of specific performance or a claim for damages or any other method of enforcement—had to be brought within six years. To the extent her suit here sought the deed Julian and Sheilah had promised in the contract, her suit might

---

**10.** This statute was applicable in 1977, the end of the limitations period according to Sheilah, as NMSA 1953, Section 37-1-3 (Supp.1975).

well have been, and probably was, barred by limitations.

■ But Annie's suit sought more than delivery of the promised deed; it also sought a decree quieting title to the Cantina property in her name. Her entitlement to such a decree was not dependent on her entitlement to delivery of a deed to the property. Her status as purchaser under a real estate contract, which we are assuming she had fully performed, qualified her as the equitable owner of the property, and that ownership was not cut off by the running of the statute of limitations on claims to enforce written contracts. *See Conway v. San Miguel County Bd. of Educ.*, 59 N.M. 242, 254, 282 P.2d 719, 727 (1955) (contract vendee had equitable title even though promise to convey never fulfilled); *Albarado v. Chavez*, 36 N.M. 186, 188, 10 P.2d 1102, 1103 (1932) (entire equitable ownership was in purchaser, even though deed was undelivered); *see also Mesich v. Board of Comm'rs of McKinley County*, 46 N.M. 412, 416–17, 129 P.2d 974, 976–77 (1942); *Val Verde Hotel Co. v. Ross*, 30 N.M. 270, 272, 231 P. 702, 702 (1924).

■ We have already adopted the rule in this state that an equitable owner in possession, whose possession is undisturbed, does not have to sue to convert his or her equitable title into legal title. *Wooley v. Shell Petroleum Corp.*, 39 N.M. 256, 268, 45 P.2d 927, 934 (1935). Other jurisdictions have similarly held that statutes of limitations do not apply to quiet title actions. *See, e.g., Oates v. Nelson*, 269 Cal.App.2d 18, 21, 74 Cal.Rptr. 475, 477 (1969); *Barnes v. Spangler*, 98 Colo. 407, 411, 56 P.2d 31, 33 (1936); *see generally* 65 Am.Jur.2d *Quieting Title* §§ 54, 55, 56 (1972). Unless the equitable owner's claim is barred by NMSA 1978, Sections 37–1–21 or –22 (Repl. Pamp.1990) (our statutes on adverse possession), we hold that a contract vendee's claim of title, where the vendee has fully performed and whether or not he or she is in possession, is not cut off by the running of a statute of limitations.

■ The situation is quite different, however, when the contract vendee sues to quiet title and the holder of legal title sets up the defense of laches. The doctrine of laches prevents litigation of a stale claim where the claim should have been brought at an earlier time and the delay has worked to the prejudice of the party resisting the claim. *Cave v. Cave*, 81 N.M. 797, 802, 474 P.2d 480, 485 (1970). While both defenses, limitations and laches, share a common underpinning in their policy to prevent litigation of stale claims, laches is the more flexible defense, allowing the particular facts of a dispute to be considered in determining whether a party should be foreclosed from bringing a claim because of a delay in asserting his or her rights. It is well established that an action to quiet title may in an appropriate case be barred by the plaintiff's laches. 65 Am.Jur.2d *Quieting Title* § 57. This defense was therefore available despite the fact that a statute of limitations defense was not.

## IV.

■ It remains to be determined whether the trial court properly applied the elements of laches to the facts in this case and whether the court's findings of fact are supported by substantial evidence. The elements required to be proved by one asserting the defense are:

(1) Conduct on the part of the defendant, giving rise to the situation of which complaint is made and for which the complainant seeks a remedy;

(2) delay in asserting the complainant's rights, the complainant having had knowledge or notice of the defendant's conduct and having been afforded an opportunity to institute a suit;

(3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which [she] bases [her] suit; and

(4) injury or prejudice to the defendant in the event relief is accorded to the complainant or the suit is not held to be barred.

*Baker v. Benedict*, 92 N.M. 283, 286, 587 P.2d 430, 433 (1978); *Cave v. Cave*, 81 N.M. at 802–03, 474 P.2d at 485–86.

As to element (1), Annie does not dispute that Sheilah and Julian continued to possess the Cantina property after 1971 (when Julian told Annie the contract was "all paid") and manifested a claim of ownership to it by, among other things, having tax deeds from the state issued in their names in the late 1960's and early 1970's and leasing the property to Mr. Walker in 1982—conduct for which Annie seeks the remedy of a quiet title decree in this action. Annie claims that Sheilah and Julian's possession after 1971 was consistent with the long-term lease executed at the time of the real estate contract, but that lease had been forgotten and in any event had expired in 1982, as the trial court found. Element (1) was satisfied.

As to element (2), Annie delayed for sixteen years before asserting her rights by filing this suit; she delayed for almost fifteen years, until after Julian's death and after discovering the expired long-term lease, before making any claim at all. The trial court also found that she was on notice from shortly after the death of her husband Toby that Julian and Sheilah claimed ownership of the property, and this finding was amply supported by the evidence. Annie seeks to excuse her inaction during this period by pointing to her trust in her son, on whom she relied to manage her affairs and her property, arguing that this relationship resulted in lack of knowledge about her claim and deprived her of the opportunity to institute a suit. The short answer to this is that the trial court found otherwise and its finding is supported by Annie's own testimony (*e.g.*, that she thought the $600 monthly rent under the long-term lease was only for the Parking Lot and that she never objected to Julian's using the Cantina property as his own) and by the evidence noted above supporting the first element of laches.

Element (3) is similarly supported. Sheilah had no indication that Annie would claim ownership of the property until one and a half years after Julian's death, about one year before the instant suit was filed. The trial court found that there were continuing discussions among Annie, Julian and other members of the family (presumably about property matters), and that no dispute was articulated with respect to the Cantina property until that time.

Finally, Annie asserts that element (4) is "possibly" lacking in this case. The trial court, however, clearly found that the prejudice to Sheilah's position arising from Annie's long delay in asserting her claim until after the death of Julian was significant. The court noted that Sheilah's defense was unfairly prejudiced "in particular by Plaintiff's failure to assert a claim during the 13 year period between April 1971 and October 1984 while Julian Garcia was still living and would have been available to testify." In considering Sheilah's motion to dismiss, the trial judge stated: "I must observe, however, that this whole matter is missing the main actor in the scenario. And we are trying to put flesh and bones on the skeleton that he left in the form of these documents." It was Julian who conceived the idea of having his mother reinvest her condemnation proceeds by purchasing from him and Sheilah the land (excluding the building) on which his business was located; it was he who arranged for the lease-back of the land to him and Sheilah for at least fifteen years; it was he who told his mother not to make any more payments after less than one-fourth of the number called for by the contract had been made; and it was he who could have enlightened the court and the jury on the parties' understanding and intentions at the time of these transactions years before. The trial court found that his untimely death prejudiced Sheilah's ability to conduct her defense. We cannot say that this finding lacked support in the evidence or was an abuse of discretion.

The defense of laches is not favored, and it should be applied sparingly. *Cain v. Cain,* 91 N.M. 423–25, 575 P.2d 607–09 (1978). It will not stand as a bar to a suit to quiet title in many, or even most, cases, because the purpose of such a suit is often to remove clouds on title that originated many years before the suit is brought and that are wholly lacking in substance. Where, however, the facts surrounding a particular dispute over owner-

ship of property establish to a court's satisfaction that the suit has not been timely brought and that a defending party—particularly one in possession and asserting a tenable claim of ownership—has been unfairly prejudiced by the passage of time, then application of the equitable defense of laches, in the trial court's sound discretion and based on substantial evidence in the record, serves the policy of permitting titles to be cleared of stale claims. We are satisfied that that policy has been served in this instance and that Annie, having been afforded an opportunity to submit her claim to a tribunal empowered to adjudicate it, need not be afforded another.

The judgment is therefore affirmed.

IT IS SO ORDERED.

SOSA, C.J., and RANSOM, J., concur.