1998-NMCA-056

957 P.2d 1163

Bernice A. BURNHAM, David A. Burnham, and Barbara W. Coleman, Trustees under Trust Agreement dated January 1, 1973, Plaintiffs–Appellees,

v.

Group One: CITY OF FARMINGTON, a municipal corporation, L.L. Greenleaf, Elmer W. Lanier, and Doris Jean Lanier

Group Two: J.J. DeWeerd, Louise A. DeWeerd, Charles P. Cole, Nadine M. Cole, Ross Roll, Wanda Roll, Julius Phillip Schenck, Alberta Schenck, if living; if deceased, the unknown heirs of said Group Two Defendants, deceased; and all Unknown Claims of Interest in the Premises Adverse to the Plaintiffs, Defendants–Appellants.

No. 17917.

Court of Appeals of New Mexico.

March 18, 1998.

Robin A. Goble, Alice Tomlinson Lorenz, Miller, Stratvert, & Torgerson, P.A., Albuquerque, for Appellees.

John A. Dean, Jr., Curtis and Dean, Farmington, for Appellant City of Farmington.

## OPINION

WECHSLER, Judge.

{1} The boundary line between the properties in this quiet title dispute is the Animas River as it ran in February 1943. The district court located the boundary on the north edge of the river. We conclude that the boundary call to the river in the deeds at issue takes to the middle of the river rather than its north edge. We further conclude that there was substantial evidence for the district court to find that the main channel of the Animas River as it existed in February 1943 was the north channel, and given this finding, that the call to the Animas River located the boundary in the middle or center of the north or main channel of the river. Thus, we affirm the district court's finding as to the location of the main channel of the river and reverse with respect to the boundary location and remand for further proceedings.

### Factual and Procedural Background

{2} Plaintiffs Bernice Burnham, David A. Burnham, and Barbara Coleman, as trustees of the Bernice A. Burnham Revocable Living Trust (Burnhams), brought this quiet title action against the City of Farmington (City) and its predecessors in title regarding property which at the time of trial was an island between the north and south branches of the Animas River. Both chains of title emanate from property owned by Newton C. and Esta I. Hubbs (Hubbs) described as:

The South half of the Northwest quarter (S1/2NW1/4) and the West half of the Southwest quarter (W1/2SW1/4) of Section Twelve (12), Township Twenty Nine (29) North, of Range Thirteen (13) West, N.M.P.M.

{3} In 1943 and 1946, Hubbs sold the property in two separate conveyances. The difficulties in the title arise from the problematic calls Hubbs used referring to the river

as the property boundary in these conveyances. The Burnhams claim their title through the Hubbs conveyance of the larger of the two parts of the Hubbs property. In February 1946, Hubbs conveyed to J.W. Dickey this property, described as follows:

The South half of the North West quarter (S1/2 NW1/4), and the West half of the South West Quarter (W1/2 SW1/4), Section Twelve (12), Township Twenty-nine (29), North, Range Thirteen (13) West, N.M.P.M.

### EXCEPTING

*That part* of the South West Quarter of the North West Quarter (SW1/4 NW1/4) of said section Twelve (12) *lying North of the Animas River.*

Lands herein conveyed containing 150 acres, more or less. (Some emphasis added; other emphasis omitted.)

The Burnhams received the disputed property through a 1951 warranty deed from Dickey to Bernice A. and O.L. Burnham which contained the same description as the Hubbs–Dickey deed. After O.L. Burnham died, Bernice A. Burnham transferred the property to the Bernice A. Burnham Revocable Living Trust (Trust).

{4} The City's chain of title begins with the Hubbs conveyance of the smaller part of the original property to Julius Philip Schenck. The deed contains the following description which is the nub of this controversy:

All that part of the South half of the Northwest one fourth (S1/2 NW1/4) of Section Twelve (12), Township Twenty nine (29), North, Range Thirteen (13) West, N.M.P.M. *running North and West from the Animas River as it now runs,* to the North and West line of the said above described lands. (Some emphasis omitted.)

When the Schencks conveyed to J.J. and Louise A. DeWeerd on August 11, 1950, the warranty deed did not include reference to the Animas River. The description read:

All that part of the SW1/4NW1/4 of Section 12 and the NW1/4NW1/4 of Section 12, all in Township 29 North, Range 13

West, N.M.P.M., lying south of the right of way of the Denver and Rio Grande Railroad as now constructed over and across the same. (Emphasis omitted.)

{5} On August 19, 1950, the DeWeerds deeded a portion of their property to San Juan Machine Works, again making reference to the river as follows:

All that part of the SW1/4NW1/4 of Section 12 and the NW1/4NW1/4 of Section 12, all in Township 29 North, Range 13 West, N.M.P.M. lying south of the right of way of the Denver and Rio Grande Railroad as now constructed over and across the same.

. . . .

Said land being only that portion of the above W1/2NW1/4 of Section 12 *lying between the D & RGW Railroad right of way and the present course of the main channel of the Animas River.* (Some emphasis omitted.)

On July 6, 1970, the DeWeerds conveyed whatever remaining interest they had in the property to Charles P. and Nadine M. Cole, describing the conveyed property in a real estate contract as:

[A]ll that part of the W1/2NW1/4 of Section 12, T29N, R13W, lying between the present course and/or channels of the Animas River, as the same now exists. This tract being part of an island covered with brush and trees and located between the new or present channel of the river and the old or 1943 riverbed of said river. (Emphasis omitted.)

Conveyances to Ross and Wanda Roll (June 17, 1974), to Elmer W. and Doris Jean Lanier (March 23, 1976), to L.L. Greanleaf [sic]

(February 2, 1980), and ultimately to the City (May 21, 1991), contained the same property description as the DeWeerd–Cole conveyance.

{6} Bernice A. Burnham and the DeWeerds exchanged quitclaim deeds on October 27, 1959, after the Burnhams had filed a quiet title action in which the DeWeerds were not named parties. The Burnham to DeWeerd deed included:

All that part of the South Half of the Northwest Quarter (S1/2NW1/4) of Section 12, Township 29 North, Range 13, West of the N.M.P.M., *lying North and West of the Animas River,* as such river existed on February 27, 1943. (Some emphasis omitted.)

The DeWeerd to Burnham deed stated the following:

All that part of the South Half of the Northwest Quarter (S1/2NW1/4) of Section 12, Township 29 North, Range 13 West of the N.M.P.M., *lying South and East of the Animas River,* as such river existed on February 27, 1943. (Some emphasis omitted.)

{7} The parties do not dispute that the location of the flow of the Animas River has changed over time. The parties introduced as trial exhibits a 1938 hydrological survey, showing principally a large single area of water flow or channel in the area of dispute, and aerial photographs in 1950 by the Corps of Engineers and in 1973 by the Bureau of Land Management, showing distinct north and south channels of flow. The Burnhams' Appendix A to their answer brief depicts the area in question as follows:

S½NW¼

SJ – San Juan
    Machine Works

==== – Course of
    Animas River wet
    water in 1938 State
    Engineer's Water Rights
    Map/Hydrological Survey

/// – Property at Issue

++++ – DRG Railroad
    Right of Way

Island
Property

ANIMAS RIVER (SOUTH CHANNEL)

(thread or middle)

(NORTH CHANNEL)

BROWNING PARKWAY

W½SW¼

SJ

{8} The district court concluded that the Trust has good title to the disputed property.

*Property Boundary*

{9} The district court did not enter any finding of fact concerning the boundary of the disputed property. By quieting title in the Burnhams, it necessarily found that in February 1943, the property boundary ran from the northernmost edge of the north channel of the Animas River rather than from the center of the river. The City argues that the district court erred by failing to find that the center of the river was the appropriate boundary. We review issues of law raised in this argument de novo, and the factual issues for substantial evidence. *See Strata Prod. Co. v. Mercury Exploration Co.,* 121 N.M. 622, 627, 916 P.2d 822, 827 (1996).

{10} We construe a deed to give effect to the intent of the grantor. *See Pa-*

*dilla v. City of Santa Fe,* 107 N.M. 107, 110, 753 P.2d 353, 356 (Ct.App.1988). To accomplish this purpose, we follow rules of construction or presumptions when the deed is not clear. *See id.* at 112, 753 P.2d at 358. A strong presumption exists that a conveyance of land which describes a boundary with width conveys to the center of the boundary monument absent a contrary intent manifested in the conveying instrument in the context of surrounding circumstances. *See Parr v. Worley,* 93 N.M. 229, 230, 599 P.2d 382, 383 (1979); *Tagliaferri v. Grande,* 16 N.M. 486, 493, 120 P. 730, 732 (1911); 3 *American Law of Real Property* § 22.05[3][g] (Arthur R. Gaudio ed., 1994). Our Supreme Court has applied this presumption to deeds calling for a boundary of a highway, an alley, and an acequia. *See Parr,* 93 N.M. at 230, 599 P.2d at 383 (it is a rebuttable presumption " 'practically without exception that a conveyance of land abutting on a road, highway, alley, or other way, is presumed to take the fee to the center line of the way' " (quoting *Nickson v. Garry,* 51 N.M. 100, 106, 179 P.2d 524, 527–28 (1947))); *Tagliaferri,* 16 N.M. at 493, 120 P. at 732 ("[A] boundary call for an irrigating ditch goes, in the absence of some contrary intent manifested in the instrument, to the middle of the ditch."). The general purpose of the presumption is to ensure that the title to the two narrow strips of land surrounding such boundaries is not left uncertain. *See Parr,* 93 N.M. at 230, 599 P.2d at 383; 3 *American Law of Real Property, supra,* § 22.05[3][g]; *see also Gentile v. Crossan,* 7 N.M. 589, 598, 38 P. 247, 249–50 (1894) ("Ordinarily, when a natural object is used as a boundary, the middle of the object named constitutes the line, except in case of a range of mountains, when it goes to the comb or dividing line of the ridge."); *Padilla,* 107 N.M. at 110, 753 P.2d at 356 (same).

{11} The same need for completeness applies when a stream or river describes the boundary of a conveyance. *See Nilsson v. Latimer,* 281 Ark. 325, 664 S.W.2d 447, 448–49 (1984); *Wilt v. Endicott,* 68 Or.App. 481, 684 P.2d 595, 598 (1984); 3 *American Law of Real Property, supra,* § 22.05[3][g]. The presumption is rebuttable by wording which necessarily excludes the boundary monument from the description of the property conveyed when the instrument is viewed with its attending circumstances. *See Parr,* 93 N.M. at 230, 599 P.2d at 383; *Nickson,* 51 N.M. at 106, 179 P.2d at 527–28; 3 *American Law of Real Property, supra,* § 22.05[3][g] (presumption not applicable unless person conveying owns boundary area in dispute). However, if the conveyance language " 'is of doubtful meaning, the presumption will prevail.' " *Parr,* 93 N.M. at 230, 599 P.2d at 383 (quoting *Nickson,* 51 N.M. at 106, 179 P.2d at 528).

{12} The Hubbs–Schenck deed conveys property "running North and West from the Animas River as it now runs." According to the Burnhams, this language of the deed establishes that the property conveyed began from the northern edge of the river because the words "to" and "from", when used in a boundary description, "are to be understood as terms of exclusion absent some manifest indication that they were used in a different sense." But, our Supreme Court has specifically concluded otherwise. The deed in *Parr* described the property as "[a]ll that part of the Southeast Quarter . . . lying to the East of United States Highway No. 62 and 180." 93 N.M. at 231, 599 P.2d at 384. The Supreme Court applied the general rule that the boundary runs to the center of a monument, not accepting the argument that the word "to" was intended as a word of exclusion. *See id.*

{13} The Burnhams argue additionally that the testimony of their expert witness Robert Stannard Jr., a civil engineer and licensed surveyor, rebutted the presumption. Mr. Stannard testified that in addition to the conveyance language, the facts that the DeWeerds only surveyed land lying to the north channel of the Animas River, and that the summation of the quantities of acreage that Hubbs conveyed to Dickey and Schenck amounted to nearly all of their 160 acres, provided substantial evidence to the district court to conclude that the presumption should not be found in this case. We do not agree with these conclusions.

{14} To construe a deed, the courts generally look to the parties' intent based on the language of the deed, " 'viewed in the

light of the surrounding circumstances.'" *Id.* at 230, 599 P.2d at 383 (quoting *Nickson,* 51 N.M. at 106, 179 P.2d at 527); *accord Camino Sin Pasada Neighborhood Ass'n v. Rockstroh,* 119 N.M. 212, 214, 889 P.2d 247, 249 (Ct.App.1994). The DeWeerds were not a party to the Hubbs–Schenck conveyance. Their actions when they ordered a survey for the property deeded to San Juan Machine Works in 1950, several years after the conveyance do not have much bearing on the intent of Hubbs in 1943, particularly considering Mr. DeWeerd's testimony that he obtained the survey only for the property he deeded to San Juan Machine Works. Concerning Mr. Stannard's conclusions regarding the quantity of acreage conveyed, the Supreme Court has accorded little weight to such testimony.

{15} In *Parr,* the deed described the conveyance as "containing 25 acres, more or less." 93 N.M. at 229, 599 P.2d at 382. A survey indicated that the property area measured 25.80 acres to the edge of the highway and 31.57 acres if measured to the center. *See id.* Despite the near precision of the measurement to the highway edge, the Court held that the deed "did not clearly and plainly disclose an intention to exclude the east side of the highway from the description." *Id.* at 231, 599 P.2d at 384. The Burnhams make a weaker case here for a variety of reasons: (1) the number of acres is not contained in the Hubbs–Schenck deed; (2) the Hubbs–Dickey deed which describes that conveyance as containing 150 acres more or less and is the basis for the Burnhams' argument, was entered into in 1946, three years after the Hubbs–Schenck deed; and (3) even though Mr. Stannard's explanation better approximates the Hubbs acreage, it still does not fully account for the 160 acres.

■ {16} We find more compelling the fact that Bernice A. Burnham, the creator and a trustee of the Trust, exchanged quitclaim deeds with the DeWeerds in 1959 in connection with, according to Mr. DeWeerd's testimony, a quiet title lawsuit initiated by Ms. Burnham. The DeWeerds and Ms. Burnham acknowledged, at that time, that the property "lying North and West of the Animas River, as such river existed on February 27, 1943," belonged to the DeWeerds and that the property "lying South and East of the Animas River, as such river existed on February 27, 1943," belonged to Ms. Burnham. The quitclaim deeds changed the description from the original Hubbs–Schenck deed. By dividing the property as they did, the parties to the quitclaim deeds, including Ms. Burnham, recognized the river as it existed on February 27, 1943 as the boundary line between their properties. *See Camino Sin Pasada Neighborhood Ass'n,* 119 N.M. at 214, 889 P.2d at 249 (intent based upon language, viewed in conjunction with surrounding circumstances).

{17} By accepting as her property that property lying south and east of the river, Ms. Burnham gave up her claim to the property from the center of the river to the northern edge of the river. The description in the quitclaim deed allocating the property to her cannot be read to include such an area. *See id.* If the Hubbs–Schenck deed can be read as the Burnhams presented and the district court found, Ms. Burnham relinquished an interest in the property from the northernmost boundary of the Animas River as it existed on February 27, 1943 to the center of the river on that date in the quitclaim deed exchange. The trust is bound by her actions. *See Cruikshank v. L.H. Bossier, Inc.,* 129 So.2d 206, 212–13 (La.Ct.App. 1961) (successors in title bound by contract and agreement between prior owners); *Smith v. Mountrail County,* 70 N.W.2d 518, 524 (N.D.1955) (successor in interest is bound by earlier judgment against individual in chain of title); *cf. Abo Petroleum Corp. v. Amstutz,* 93 N.M. 332, 335, 600 P.2d 278, 281 (1979) (grantor's conveyance can convey no more than originally acquired).

{18} We view the quitclaim deeds as determinative since they were intended to resolve boundary differences between Ms. Burnham and the DeWeerds. We note that although the district court found that the Hubbs–Schenck deed was dated February 24, 1943, it stated that the ultimate issue in the case was the location of the river on February 27, 1943, the date adopted by the quitclaim deeds.

*Location of the Animas River in February 1943*

{19}  As to the location of the Animas River in February 1943, the district court found that "[t]he main channel of the Animas River [on February 27, 1943] as it crossed this disputed area was the north channel, north of the disputed island, as it proceeded to the headgate of the North Farmington Ditch." It made no findings concerning the extent of the river or its southern bank.

{20}  The City attacks the district court's finding that the main channel of the Animas River in February 1943 was the north channel of the present day river. It contends that the district court did not have any evidence to support a finding that the 1943 river "was *only* located at the site of the present day northern channel." Appellate review entails the review of the lower court's findings of fact for substantial evidence. *See Landavazo v. Sanchez,* 111 N.M. 137, 138, 802 P.2d 1283, 1284 (1990) ("Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion."); *State ex rel. Hooten Constr. Co. v. Borsberry Constr. Co.,* 108 N.M. 192, 193, 769 P.2d 726, 727 (1989). In doing so, the appellate court views the evidence "in a light most favorable to the prevailing party and disregard[s] any inferences and evidence to the contrary." *Montoya v. Torres,* 113 N.M. 105, 109, 823 P.2d 905, 909 (1991).

{21}  There was substantial evidence to support the district court's finding. John Easley testified that as a child, he swam in the river near the San Juan Machine Works location. He described the river in that area in the early 1940s as 100 to 150 feet wide, chest deep on a man, and swift enough to carry away a child. Significantly, he designated the location of the headgate to the North Farmington Ditch on an aerial map on the north channel of the present Animas River near where he used to swim. Barbara Coleman and David Easley testified that they also played by the river as children in the late 1940s and early 1950s. Both remembered the current north channel as being wide and deep adjacent on the north side to a steep embankment which still exists.

{22}  Mr. Stannard also provided the district court with testimony based upon his review of the deed abstracts, aerial photographs, and the 1938 state engineer's water rights map of the property in question. Mr. Stannard superimposed an overlay of the 1938 state engineer's water rights map on a 1985 aerial photograph of the area and pointed out that the dotted line located on the northernmost area of the "old river channel" on the 1938 map "conformed well" with the 1985 depiction of the current north channel of the river. He testified to his opinion that this dotted line formed the boundary for the property which Hubbs conveyed to Schenck in 1943. According to Mr. Stannard's testimony, by using the present northern edge of the north channel of the river to calculate the acreage which Hubbs originally conveyed, the total acreage was approximately the number of acres owned by .Hubbs and conveyed in the Dickey and Burnham deeds.

{23}  The City assails the district court's finding with an opposite view of the evidence. According to the City, the dotted line to which the Burnhams's expert witness referred and the district court located the northern boundary was not the river, but, as described by its witnesses Albert Mortensen and Gene McDonald, the North Farmington Ditch. The City believes that the evidence demonstrates that in 1943 the Animas River "straddled the subject property." The district court did not, however, find that the north channel was the only channel or part of the Animas River in the area in 1943 as the City argues. The district court found that the north channel ran to the headgate of the North Farmington Ditch indicating that this part of the river was the main channel in 1943.

{24}  The City urges that this Court accept its position because it "believes that the location of the Animas River in February of 1943 is best approximated by the 1938 hydrological survey." The task of reconstructing a river as it existed a half century before is an extraordinarily difficult one. The district court utilized the evidence before it to reach a different conclusion from that advanced by the City. However, when we review a substantial evidence claim, "[t]he question is not

whether substantial evidence would have supported an opposite result; it is whether such evidence supports the result reached." *Hernandez v. Mead Foods, Inc.*, 104 N.M. 67, 71, 716 P.2d 645, 649 (Ct.App.1986). We affirm the district court's finding.

*The Center of the Riverbed or the Main Channel of the River*

■ {25} The Burnhams assert that if the boundary call is to the center of the Animas River, such reference relates to the main channel of the river as it existed in February 1943. Thus, according to the Burnhams' position, as the district court's finding that the north channel of the river was the main channel in February 1943 is supported by substantial evidence, the legal presumption locates the property boundary north of the disputed property. We agree with the Burnhams' proposition.

■ {26} Generally, the center of a river would be in the middle of the river's banks. The river's banks are defined as the "boundaries which confine the water to its channel throughout the entire width when [a] stream is carrying its maximum quantity of water." Black's Law Dictionary 1328 (6th ed.1990). Particularly, in an arid or semi-arid state such as New Mexico, the water flow through a river's banks need not be continuous. *See Martinez v. Cook*, 56 N.M. 343, 350–51, 244 P.2d 134, 138–39 (1952). But although a river may have defined banks, when it is stated as a boundary monument, the court's role is to effectuate the parties' intent when determining title to property. *See State ex rel. State Highway Dep't v. Davis*, 85 N.M. 759, 762, 517 P.2d 743, 746 (1973). The evidence in this case, when viewed in the light most favorable to the district court's decision, indicates that the Burnhams' chain of title runs from the center of the north channel of the Animas River.

■ {27} The district court found that the north channel was the main channel of the Animas River in February 1943. With the north channel as the main channel, under what circumstances would Hubbs intend to convey a substantial portion of the riverbed to the Schencks? The rational response is circumstances in which water is flowing with-

in the riverbed. In that case, Hubbs' intent of conveying to the Schencks the property north and west of the Animas River "as it now runs" has meaning. If, on the other hand, the river were not running in the area south of the north channel, it would not make sense for Hubbs to convey such an area of property through a presumption that their conveyance includes the property they own to the center of a river; the river was not running there. We will not presume an irrational intent when construing a contract or deed. *See Rael v. Cisneros*, 82 N.M. 705, 708, 487 P.2d 133, 136 (1971) (deed is a specialized form of a contract); *cf. Hyder v. Brenton*, 93 N.M. 378, 381, 600 P.2d 830, 833 (Ct.App.1979) (restrictive covenant in deed description "must be considered reasonably, though strictly, and an illogical, unnatural or strained construction must be avoided").

{28} Although the City contends that water runs throughout the area between the two outer banks, the Hubbs–Schenck deed establishes the boundary of the river using the present-tense language of "as it now runs." To construe this language to mean anywhere within the banks of the river in which water may occasionally flow, rather than a flowing channel of the river, does not comport with reasonable action of Hubbs in the circumstances.

{29} Additionally, accepting the district court's finding that the north channel was the main channel of the river in February 1943, there is no consistent evidence that the disputed property was part of any channel of the river at the relevant time. The 1938 hydrological survey depicts a single channel in the disputed area. All other exhibits beginning in 1950 show separate north and south channels surrounding the property in dispute. If the channel depicted on the 1938 survey existed in 1943, it would be rational for Hubbs to convey from the center of that channel in their property description. The district court determined, however, that the character of the river so evolved that by February 1943, the main channel was the north channel, north of the disputed island, as reflected in the 1953 survey which the district court had before it. With the river having such an identity, with two separate,

distinct channels separated by a significant distance, we cannot conclude that a boundary describing property "from the Animas River as it now runs" takes to a point between the two channels of the river based on the particular language of the Hubbs–Schenck deed and the finding of the district court for which we conclude that there is substantial evidence.

{30} The center of the river for the purposes of the disputed boundary is the center of the main channel of the river as it existed in February 1943. This conclusion is consistent with the district court's observations in its May 28, 1996 Minute Order concerning the way that the DeWeerds treated their interest in the property. The DeWeerds did not retain access to the disputed property in their conveyance to San Juan Machine Works and when they conveyed to the Coles for little consideration; they did not convey access and they excluded every possible warranty. Indeed, even the deed to the City did not include access to the disputed property.

{31} As we conclude that the property boundary is the middle of the north channel of the river, we remand to the district court to determine the area between the northernmost boundary of the north channel and the middle of the channel as it existed in February 1943, as that area belongs to the City.

*Doctrine of Laches*

{32} The doctrine of laches is an equitable defense applicable when a claimant should have brought a claim at an earlier time, and the delay caused by the claimant in action prejudices the other party. *See Garcia v. Garcia,* 111 N.M. 581, 588, 808 P.2d 31, 38 (1991); *Cave v. Cave,* 81 N.M. 797, 802, 474 P.2d 480, 485 (1970). Our Supreme Court has noted that the nature of quiet title actions which may be intended to clear impediments to title which have arisen several years in the past requires that laches be used sparingly in such cases. *See Garcia,* 111 N.M. at 589, 808 P.2d at 39. We review the district court's denial of the City's defense of laches for abuse of discretion. *See id.* at 590, 808 P.2d at 40.

{33} For laches to apply, one party must engage in conduct which so alerts the other party that its rights have been negatively affected. *See id.* at 588, 808 P.2d at 38. With such knowledge or notice, the injured party must then delay in asserting its rights while the other party lacked knowledge or notice that the injured party would assert its rights, to the injury or prejudice of the other party. *See id.*

{34} In the case on appeal, the City argues that beginning in the early 1970s, the actions of the City's predecessors in interest were sufficient to put the Burnhams on notice that the City's predecessors were making a claim to the disputed property which would infringe upon the Burnhams' rights. According to the City, it was prejudiced because the Burnhams failed to take action given the notice or knowledge available to the Burnhams of these adverse claims to the disputed property. The district court rejected the laches defense finding that: (1) the City's predecessors did not exercise visible, exclusive, hostile, and continuous possession of the disputed property; and (2) incidental contacts with David Burnham prior to the City's acquisition of the property in 1991 were not sufficient to cause him to take affirmative action on behalf of the Trust. We do not believe that the district court abused its discretion.

{35} During the nearly four years that the Coles claimed title to the disputed property, they built an A–Frame cabin and a corral, kept livestock, and stored at least one vehicle on the property. They did not live on the property. Although the activity of the Coles may have been sufficient for the Burnhams to perceive a problem, when the Coles conveyed their interest in July 1974, the level of activity on the property diminished. When L.L. Greenleaf and Elmer W. and Doris Jean Lanier obtained their interest in the property, Mr. Greenleaf only occasionally walked on the property.

{36} By statute, a property owner may be divested of title to the property if another adversely possesses the property for a period of ten years. *See* NMSA 1978, § 37–1–22 (1973). Mere use and possession is not sufficient to obtain title by adverse

possession. *See Apodaca v. Tome Land & Improvement Co.,* 91 N.M. 591, 596, 577 P.2d 1237, 1242 (1978). The possessor must act in such a manner to apprise others who may claim title of the possessor's interest. *See id.* The possession must be "actual, visible, exclusive, hostile and continuous." *Id.*

{37} The doctrine of laches and the adverse possession statute do not, however, substitute for each other. One acquires clear title through adverse possession. Laches, the more flexible doctrine, may be a defense to a quiet title claim. *See Garcia,* 111 N.M. at 588, 808 P.2d at 38. But although the equitable principles of the doctrine of laches do not require the stringent elements of possession as does the adverse possession statute, the principles of equity nevertheless require that the notice to the person to be bound be clear. Even though David Burnham may have had notice from the Coles' activity, when the use of the property changed, he could reasonably have thought that even if he needed to take action at one time, he no longer was required to do so. Indeed, witnesses familiar with the property testified that they did not notice any activity on it for approximately three decades. The district court did not abuse its discretion by finding that the possession of the Coles and their successors prior to the City was not of the character so as to give knowledge or notice to the Burnhams that they were required to take action to protect their property rights. *See Garcia,* 111 N.M. at 590, 808 P.2d at 40.

{38} Nor did the district court act beyond its discretion when it found that incidental contacts with David Burnham also were insufficient to require him to take affirmative action. L.L. Greenleaf testified that he had a brief conversation with David Burnham in 1990 about sharing the costs of an access ramp to the new Browning Parkway but that he did not tell Mr. Burnham that he claimed or owned an interest in the disputed property. Nadine Cole testified that Bernice Burnham called her on the telephone to complain about an abandoned car on the disputed property. The district court determines the credibility of witnesses for the purpose of finding facts. *See Sanchez v. Homestake Mining Co.,* 102 N.M. 473, 476, 697 P.2d 156, 159 (Ct.App.1985). The district court did not abuse its discretion when weighing the import of these witnesses' testimony to ascertain whether the Burnhams needed to take legal action to protect their interest. Moreover, Mr. Greenleaf's conversation with Mr. Burnham took place in 1990 only approximately one year from the time that the Burnhams notified the City of the potential title problem.

{39} Lastly, the City claims that David Burnham had notice of adverse interest because of the survey he had prepared in 1975. The copy of the survey which the City introduced as an exhibit at trial had the name "Ross Roll" in the area of the disputed property. However, Mr. Stannard testified that it appeared as if the name had been inserted after the original survey was prepared. Further, the City did not demonstrate that David Burnham was given the survey.

*Conclusion*

{40} For the foregoing reasons, we conclude that the Hubbs–Schenck deed conveyed north and west from the center of the north channel of the Animas River as it existed in February 1943. The City's title, therefore, extends north and west from that boundary. We reverse and remand to the district court to determine the location of the middle of the north channel of the river as of February 1943 and for further proceedings consistent with this opinion.

{41} **IT IS SO ORDERED.**

PICKARD and BUSTAMANTE, JJ., concur.