2003-NMCA-035

62 P.3d 1255

**VILLAGE OF WAGON MOUND, a New Mexico Municipal Corporation, Plaintiff/Third–Party Defendant, Appellee,**

v.

**The MORA TRUST, Defendant/Third–Party Defendant, Appellant,**

v.

**Earl Berlier and Glenda Berlier, husband and wife, and Wagon Mound Ranch, L.L.C., a Kansas limited liability company, Intervenors/Third–Party Plaintiffs, Appellees.**

**Nos. 21,827, 21,917.**

Court of Appeals of New Mexico.

Dec. 18, 2002.

Certiorari Denied, No. 27,864, Jan. 31, 2003.

Stephen S. Hamilton, Montgomery & Andrews, P.A., Santa Fe, NM, for Plaintiff/Third–Party Defendant, Appellee.

Jerry Wertheim, Jerry Todd Wertheim, Carol A. Clifford, Jones, Snead, Wertheim, Wentworth & Jaramillo, P.A., Santa Fe, NM, for Defendant/Third–Party Defendant, Appellant.

Charles T. DuMars, Christina Bruff DuMars, Law & Resource Planning Associates, P.C., Albuquerque, NM, for Intervenors/Third–Party Plaintiffs, Appellees.

Randall D. Van Vleck, Santa Fe, NM, for Amicus Curiae New Mexico Municipal League, Inc.

Edward G. Newville, Special Assistant Attorney General, Office of the State Engineer, Santa Fe, NM, for Amicus Curiae New Mexico State Engineer.

*OPINION*

BUSTAMANTE, Judge.

{1} For a period of at least sixty-five years the Santa Clara Spring (the Spring) has been the sole source of water for the Village of Wagon Mound (the Village), the Mora Trust (the Trust) properties, and the lands owned by Earl and Glenda Berlier and their Wagon Mound Ranch, L.L.C. (the Berliers). A dispute arose between the Village, the Trust, and the Berliers as to the ownership and use of, as well as access to, the Spring waters. Following litigation, which we will describe in more detail hereafter, the district court entered summary judgment against the Trust and in favor of the Village and the Berliers as to their respective claims. The district court also entered summary judgment in favor of the Village and against the Berliers. The Berliers have not appealed this judgment.

{2} The Trust appeals from both judgments. As to the Village, the Trust argues that (1) as a matter of law the Village does not have any water rights in the Spring, (2) the district court improperly relied on the doctrine of laches to grant summary judgment to the Village, and (3) the pipeline easement across Trust lands is void and unenforceable as a matter of law. We affirm as to the Village, but in doing so, we clarify the reach and meaning of the judgment in favor of the Village. As to the Berliers, the Trust asserts there are disputed issues of material fact as to abandonment of water rights, the percentage of rights owned by the parties, slander of the Trust's title, and the Trust's counterclaim of water rights ownership. We affirm in part and reverse in part as to the Berliers.

## BACKGROUND

### A. Parties

{3} The Village was incorporated as a municipality in 1918. The Trust is a private trust established by Clyde and Marie Berlier for the benefit of Irene Daniels, who is the life beneficiary of the Trust. The Trust is administered by Irene's husband, Troy Daniels. The "remaindermen and contingent beneficiaries" of the Trust are Irene and Troy's children. Irene Berlier Daniels and Earl Berlier are the children of Clyde and Marie Berlier.

### B. History

{4} The Spring surfaces in the Santa Clara Canyon which is located about two miles northwest of the Village limits on land now owned by the Trust. The Spring is the only source in the area proven capable of producing a sustained and reliable flow of water. As a result, the inhabitants of the Village have relied on the Spring for domestic water consumption since before incorporation.

{5} Sim Calley (Calley) acquired the lands on which the Spring is located shortly after 1900. In 1913 the County of Mora granted

Calley the franchise to provide water from the Spring to the Village inhabitants. Calley continued to supply water to the Village either pursuant to the County franchise or a franchise with the Village through the mid–1930s. At some point in the mid–1930s, the Village decided to build its own water utility. Apparently with the backing of a Public Works Administration grant, the Village approached Calley with the notion of acquiring a right in the name of the Village to divert use of some portion of the water flow from the Spring for its purposes.

{6} On October 3, 1935, Calley and the Village signed a contract (the Contract) detailing their agreement. The recitals include Calley's representation that he is the sole owner of all the water flowing from the Spring as well as the diversion works then supplying water to the Village. The recitals generally speak of the Village's desire to "purchase and acquire [from Calley] the water and perpetual right to the use of said waters" to be more specifically described later in the Contract, along with the current distribution system, Calley's franchise rights, and necessary right-of-way over Calley's land for the Village's new waterworks.

{7} In the operative portions of the Contract, Calley purports to "sell, transfer and convey" to the Village: "(a) The perpetual right to take and divert from his said spring ... and to use all of the waters thereof necessary for the use of said Village ... and the inhabitants thereof at any time therein residing ...." (b) the "present diversion works," and "(c) [a] perpetual right of way and easement over [Calley's] lands from the said ... Spring to the Village ... for the construction and proper maintenance of the necessary diversion works ... as said works, water intake and pipe line may be located by the engineers of said Village." The Village paid Calley $35,000, a sum equal to approximately $400,000 in today's dollars, as a part of this transaction.

{8} On October 21, 1936, Calley and his wife Irene executed an "Indenture" conveying, in the structure of a deed, the property interests described in the 1935 Contract. The Indenture used the same language as the Contract to describe the property being conveyed. The only material addition to the parties' arrangement found in the Indenture is the Calleys' obligation to execute and deliver a second deed to the Village containing the definite location of the right of way easement once it was determined. The Indenture provided that upon execution of the second deed, the "floating rights-of-way ... hereby conveyed shall become definitely located and merged in said definitely located and described rights-of-way so conveyed."

{9} It is undisputed that the second deed contemplated by the Indenture was never prepared or executed. It is also undisputed that a new water line was built from the Spring to the Village, and that it was built by Calley following a construction bid process. The water line has been in continuous use by the Village since its construction.

{10} It is undisputed that Calley never sought to clarify the nature of his water rights in the Spring. The record does not reveal any filing by him with the State Engineer, nor is there any indication of any judicial decree addressing the nature or extent of his water rights in the Spring. It is also undisputed that prior to filing this action the Village never filed any document with the State Engineer asserting an ownership or other interest in the waters of the Spring. And, prior to filing this action the Village never sought a judicial declaration of its interest in the Spring.

{11} In 1948 or 1949 Clyde Berlier purchased the land on which the Spring is located from Calley. Mr. J.R. Modrall, Clyde Berlier's attorney, provided a title opinion discussing the Village/Calley Contract and Indenture. Mr. Modrall advised Clyde Berlier that the property would have to be purchased subject to the obligations inherent in the Contract and Indenture. On July 20, 1949, Clyde Berlier signed a Declaration of Ownership of Water Right Perfected Prior to March 19, 1907, though it was not filed with the State Engineer until May 1950. In the Declaration, Mr. Berlier asserted he was the owner of a right to use water from the Spring for the beneficial use of 655.44 specifically identified acres of land, at the rate of 1.5 acre-feet per irrigated acre. Also in this Declaration, Mr. Berlier stated that the Vil-

lage used a "large part" of the water from the Spring. The parties agree that work on this declaration was never completed.

{12} On March 12, 1951, Clyde and Marie Berlier filed an Application for Permit to Appropriate Surface Waters with the State Engineer. This application identified the same irrigated acreage noted in the Declaration of pre–1907 rights described above. The application for permit received initial approval from the State Engineer on July 30, 1951. Clyde Berlier was subsequently granted Water Rights License No. 2682 by the State Engineer on August 8, 1956, entitling him to 983.16 acre-feet of water per year for domestic and stock watering and for irrigation purposes upon the same 655.44 acres of land identified in the pre–1907 Declaration and the Application for Permit. The license specified a priority date of November 1949, reserving, however, the right to prove pre–1907 rights in other lands.

{13} In 1989 Clyde Berlier died leaving a will that left his share of the ranch land and water rights to his three children as tenants in common. The three children—Earl Berlier, Irene Berlier Daniels, and Vera Mae Turner—entered into an Exchange Agreement on December 20, 1989, which destroyed the tenancy in common and divided the estate property among them. The purpose of the Exchange Agreement was to resolve all disputes regarding the land conveyed to the children by designating specific tracts of land to each of them. The Exchange Agreement conveyed title to the land on which the Spring is located to the Trust. Pursuant to the Exchange Agreement, Earl Berlier and the other co-personal representative, his mother, Marie Berlier, executed a Personal Representative's Quitclaim Deed on December 21, 1990. This deed transferred the estate's interests in the land to the Trust, subject to "[t]he water contract and easements appurtenant thereto with the Village of Wagon Mound." Ultimately, by 1992, through a series of deeds executed by Marie Berlier and others, the Trust obtained complete title to the land from which the Spring emerges.

{14} The identified 655.44 acres of land irrigated under Water Rights License No. 2682 were divided among the Trust and the Berliers in the Exchange Agreement and by the deeds issued to the parties implementing the Exchange Agreement. Generally, the Trust received the identified irrigated acreage located west of Interstate 25, totaling 135.55 acres. The Berliers received the rest of the irrigated land totaling 519.89 acres located east of Interstate 25.

{15} The Exchange Agreement also divided the water rights appurtenant to the specific acreage allocated to and received by the Trust and the Berliers. The Trust's property was conveyed subject to "Easements and all water rights to the Water and Water Rights of Santa Clara Springs, and for ditches and access, for one-half (½) the Water Rights set forth in [License No. 2682] as such rights are appurtenant to [the Berliers irrigated land]." The Trust property was also conveyed subject to "[t]he water contract and easements appurtenant thereto with the Village of Wagon Mound."

{16} In 1995 and 1996, the Village began the process of reconstructing its sewer and water systems. The Village met with representatives of the Trust in 1997 to discuss building a new water line. At some point during these discussions, the Trust asserted that the 1935 Contract and 1936 Indenture were invalid and unenforceable.

**Village of Wagon Mound v. Mora Trust**

**A. Procedural Posture**

{17} On December 2, 1997, the Village filed a declaratory judgment action in district court seeking to have the Contract and Indenture declared valid. In the body of the complaint, the Village asserts it claims water rights and the perpetual right to use the water from the Spring. However, in its prayer for relief the Village only asks for a declaration that the Contract and "deed" are valid and "that under such instruments the Village has the perpetual rights to the use of the water as set forth therein" plus the "necessary right-of-way over the land ... from the Village to the ... Spring, along with any and all other rights set forth in such instruments."

{18} The Trust filed an answer generally agreeing that a controversy had arisen in that it denied the validity of the Contract and Indenture and had taken the position that the Trust could "prevent further removal by the Village of water from the ... Spring." The Trust's answer also interposed certain affirmative defenses, including non-compliance with statutory requirements and assertions of inequitable conduct on the part of the Village.

{19} The Trust also filed a counterclaim requesting (1) reformation or rescission of the Contract and Indenture [which it characterized as a lease of water] on the grounds of illegality and mistake, (2) imposition of a constructive trust, (3) an accounting from the Village for water used by it, and (4) a declaratory judgment that the waterline easement granted in the Indenture be declared void and unenforceable. As part of its factual allegations, the Trust asserted that it traced its title to the property on which the Spring is located through Clyde Berlier to the Calleys, who acquired the property "shortly after 1900." The Trust alleged that prior owners of the land first diverted and put the Spring to beneficial use in 1865. The Trust further alleged that the Trust and its predecessors at all times retained "all water rights" in the Spring; that the Spring waters always remained appurtenant to Trust lands, never having been transferred or sought to be transferred through the State Engineer. Finally, the Trust alleged that its water right included all water diverted to the Village.

{20} The Village answered the counterclaim agreeing with the Trust as to the historical underpinnings of their dispute and disagreeing only as to their legal effect. For example, the Village denied that the "Trust retains title to all water rights in the Spring" and affirmatively asserted that a "portion of the water right has been transferred to the Village." The Village also denied that the Contract and Indenture constituted a lease of water. Finally, the Village stated several affirmative defenses, among them waiver, estoppel, adverse possession, unclean hands,

and laches. Thus, the issues between the Trust and the Village were joined.

{21} The Village and the Trust filed cross-motions for summary judgment. With regard to the water, the Trust's primary argument below, as here, was that the Village had no enforceable right because the Village had failed—in fact, had not even attempted—to perfect its claim as required by the 1907 Irrigation Act, §§ 72–1–1 to –9 (1907). The Village responded to the Trust's motion for summary judgment with three arguments: (1) that the Village owned pre–1907 water rights, (2) that there were questions of fact whether the Spring was subject to State Engineer jurisdiction, and (3) that the Trust was barred by laches and estoppel from claiming that the Village's water rights are void for lack of licensure. The Village does not assert points one and two on appeal.

{22} The Village's motion for summary judgment addressed the Trust's affirmative defenses that (1) the Indenture was void as a lease under NMSA 1978, § 72–6–3 (1999), (2) the Indenture was a restraint on alienation, (3) the Village had breached the Contract and Indenture and had acted inequitably, and (4) the pipeline easement was void. For purposes of the motions, the Village accepted as true that the "1936 Indenture includes a water lease" but argued that the statute could not be applied retroactively to destroy an arrangement entered into before its enactment. The Village continues to accept the characterization of the Contract and Indenture as a lease of water for purposes of this appeal.

{23} On September 11, 2000, the district court granted summary judgment in favor of the Village and against the Trust.[1] The order granting summary judgment (1) declared the Contract and Indenture valid, and (2) declared that the Village had the perpetual right to use of the water as set forth therein, along with the necessary right-of-way over the land extending from the Village to the Spring. The order itself does not explain the basis for the court's decision. However, in its oral ruling at the hearing on the motions,

---

1.  The district court also granted summary judgment in favor of the Village and against the Berliers. The Berliers did not appeal this ruling.

the court indicated it was applying laches. The court stated:

> The Court will grant the Village of Wagon Mound's Motion for Summary Judgment against the Mora Trust finding that there are no genuine issues of material fact with respect to the issue of *laches*. It is quite clear to me that *laches* applies in this situation....

{24} The Trust makes three arguments on appeal: (1) the Village has neither statutory nor vested pre–1907 water rights in the Spring, (2) the trial court erred by applying the defense of laches "offensively" to grant summary judgment in favor of Plaintiff, and (3) the pipeline easement declared by the district court in favor of the Village is void and unenforceable.

## B.   Standard of Review

{25} A trial court's decision to grant or deny equitable relief is reviewed for an abuse of discretion. *Amkco Co. v. Welborn*, 2001–NMSC–012, ¶ 8, 130 N.M. 155, 21 P.3d 24; *Burnham v. City of Farmington*, 1998–NMCA–056, ¶ 32, 125 N.M. 129, 957 P.2d 1163. An abuse of judicial discretion will be found if the trial court "exceeded the bounds of reason, all circumstances before it being considered." *Wolf & Klar Cos. v. Garner*, 101 N.M. 116, 118, 679 P.2d 258, 260 (1984).

{26} An award of summary judgment is proper only if there are no issues of material fact, and the movant is entitled to judgment as a matter of law. *Koenig v. Perez*, 104 N.M. 664, 665–66, 726 P.2d 341, 342–43 (1986). Summary judgment is appropriate if the facts of the case are undisputed and it is only the legal interpretation of the facts that remain. *Board of County Comm'rs v. Risk Mgmt. Div.*, 120 N.M. 178, 179, 899 P.2d 1132, 1133 (1995). When relevant facts in a case are undisputed, as they are in this case, this Court will decide the legal interpretation of the facts de novo. *Johnson v. Yates Petroleum Corp.*, 1999–NMCA–066, ¶ 3, 127 N.M. 355, 981 P.2d 288.

{27} In the context of summary judgment granted by applying an equitable doctrine, the question would ordinarily be whether, under a view of the evidence most favorable to it, the Trust raised issues of material fact calling into question the court's exercise of its discretion. *See Cunningham v. Gross*, 102 N.M. 723, 726, 699 P.2d 1075, 1078 (1985) ("A suit for injunctive relief, like any other lawsuit, may be decided by summary judgment only when there are no material factual matters in dispute.") However, the Trust does not argue that there are questions of fact precluding summary judgment in favor of the Village. Rather, its argument is that under the undisputed facts it is entitled to its own summary judgment. Thus, we will not review the record for issues of fact.

## C.   Discussion

### 1.   Water Rights Issue

{28} The Trust argues that the Village has no water rights in the Spring because Calley and the Village did not comply with the statutory requirements to perfect the Village's claimed water rights. Without belaboring the point, it is undisputed that since 1936 the Village has done literally nothing to comply with the requirements of the Irrigation Act. And, prior to this litigation, the Village did nothing to establish pre–1907 water rights in its own right or in its predecessors. Here the Village makes some argument that Calley owned pre–1907 rights, but it fails to cite any facts in the record to support the argument. The Village's primary point is that there is no disagreement between it and the Trust about pre–1907 usage of the water. Thus, the Village emphasizes that it admitted the allegations made by the Trust in its counterclaim about nineteenth century beneficial uses of the Spring. This is not enough. Simple admission of a general allegation made by a party-opponent, unconnected to the Village's specific predecessor, is simply inadequate to prove a water right good against the world. *See State ex rel. Reynolds v. Holguin*, 95 N.M. 15, 16, 618 P.2d 359, 360 (1980) (stating that proof that a vested water right was initiated prior to March 19, 1907, the effective date of the State Water Code, is required where no application for a water right was submitted to the State Engineer). There is no question that the Village has not complied with the

Irrigation Act. The State Engineer has not recognized, permitted or licensed any right to appropriate water by the Village. And, there has been no adjudication of a water right in the Village.

{29} Thus, we agree with the Trust that the Village does not have a "water right" in the sense that term is normally used in New Mexico. The summary judgment should not be read to create or acknowledge a "water right" as such in the Village. The only perfected water right in the Spring is that reflected in the license granted to Clyde Berlier and which is now shared by the Trust and the Berliers.

■ {30} This does not end the discussion, however. The question remains whether the Village may yet enforce the Contract and Indenture against the Trust and the Berliers and receive water from the Spring as a matter of contractual obligation. We hold that the Village does have an enforceable contractual right to receive and use Spring water for municipal services.

{31} For purposes of the argument in the district court, the Village accepted the Trust's characterization of the Contract and Indenture as a "lease" of water. The Village continues to do so here. We also accept the characterization, though only partially, because we do not believe it is fully descriptive of the legal relationship created by the Contract and Indenture and because the parties do not agree on what a lease of water entails. Generally extrapolating from the Irrigation Act and treating a lease of water as a conveyance of a water right for a specified length of time, the Trust argues that leases are subject to all State Engineer approval processes applicable to all transfer of water rights. The Village counters that there has been no transfer of place of use, purpose or point of diversion of pre- or post–1907 rights and, thus, there is no need to invoke the State Engineer's jurisdiction.

{32} With one caveat, we agree with the Village's approach. Our caveat arises from the Village's reliance on the existence of pre–1907 rights in Calley for part of its argument. As we have already noted, there is no evidence—certainly no finding-of perfected or recognized pre–1907 rights in Calley.

However, the existence of a pre–1907 right in Calley is not necessary to the enforceability of the Contract and Indenture.

{33} We are not aware of any provisions of state law in effect in 1935 and 1936 that made it unlawful or improper for an owner of property such as Calley to agree to allow an entity, such as the Village, to use water the landowner would otherwise use on his property. Even today such an arrangement would be enforceable as between the two parties, though probably not enforceable against other persons claiming rights in waters emanating from the same source. *See McCasland v. Miskell,* 119 N.M. 390, 395, 890 P.2d 1322, 1327 (Ct.App.1994) (citing Charles T. DuMars, *New Mexico Water Law: An Overview and Discussion of Current Issues,* 22 Nat. Resources J. 1045, 1047 (1982)). The enforceability of such an agreement between two parties is enhanced if the agreement does not seek to work an actual transfer of any water right, but rather only extends use of the water to the non-owning party from the owner. That is the sense we attribute to the Contract and Indenture and the summary judgment entered by the district court, as we have explained above.

{34} The issue left by this approach is whether the Contract and Indenture are similarly enforceable as a contract obligation against the Trust and the Berliers. We hold that they are. The Trust and the Berliers received the property as beneficiaries of Clyde and Marie Berlier's estate expressly subject to the Contract and Indenture. Clyde and Marie Berlier purchased the property in 1949 from the Calleys with knowledge of the Contract and Indenture and the title opinion from their attorney stating that the property would be subject to the Contract and Indenture upon and after purchase. No one questioned the enforceability of the Contract and Indenture until 1997. We believe these are the circumstances which prompted and underlay the district court's reliance on laches for its decision.

■ {35} "Laches will lie when, in addition to other factors, there has been an unexplainable delay of such duration in asserting a claim as to render enforcement of such

claim inequitable." *Skaggs v. Conoco, Inc.,* 1998–NMCA–061, ¶ 14, 125 N.M. 97, 957 P.2d 526.

> The elements of laches are: (1) conduct on the part of another which forms the basis for the litigation in question; (2) delay in the assertion of the complaining party's rights; (3) lack of knowledge or notice on the part of the defendant that the complaining party would assert such rights; and (4) injury or prejudice to the defendant in the event relief is accorded to the complaining party or the suit is not barred.

*Id.; Garcia v. Garcia,* 111 N.M. 581, 588, 808 P.2d 31, 38 (1991). The Trust does not argue that the elements of laches were not present under the facts of this case.

■ {36} Thus, the only issue is whether the district court abused its discretion in applying laches. We hold that it did not. A time span of sixty-one years (from the payment of significant consideration and the signing of the Indenture) is obviously a long period of time, all spent by the Village relying on the Calley arrangement for its water. The span of forty-eight years since Clyde Berlier purchased the property is not significantly shorter. When the time lapse is combined with the fact that the Spring is the only proven source of water for the Village, we can find no fault with a decision which decides it is too late to challenge the enforceability of the contractual obligations and responsibilities grounded in the Contract and Indenture.

{37} We are aware that the practical effect of the district court's and our decision may be to create the functional equivalent of a water right in the Village. This is so because it appears that no one else has any claim to the Spring. This circumstance fortuitously allows us to resolve this case with little concern that our Opinion will have any effect beyond these parties. If others are able to make a claim to the waters of the Spring, they will not be bound by this decision in proving water rights superior to the Village's. The Village's right to use Spring waters is at this point purely derivative of the Trust's and Berliers' water rights under License No. 2682.

## 2. Offensive Use of Laches

■ {38} The Trust argues that the Village improperly used the doctrine of laches offensively to bar not only the Trust's counterclaims, but also its affirmative defenses. The Trust asserts that the Village should not have been able to assert laches in responding to both their negative and affirmative defense that the Village's claimed water rights under the Contract and Indenture were void because laches can only be raised as a defense. The Trust complains that by applying laches "offensively" the trial court improperly avoided the undisputed material facts showing the Village has no water rights. We disagree with the Trust on a number of grounds.

{39} First, it is noteworthy that the Village in fact did not include laches in its pleadings until it filed its reply to the Trust's counterclaim. In its reply, the Village clearly and specifically raised laches in its affirmative defenses stating that "Defendant's counterclaims are barred by the doctrine of laches." When a plaintiff is defending against a counterclaim, the plaintiff "for all practical purposes, is litigating in the capacity of a defendant" and may make use of Rule 1–012(B) affirmative defenses. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1347 at 185 (2d ed.1990); *see Angelini v. Delaney,* 156 Or. App. 293, 966 P.2d 223, 229 (1998) (stating what plaintiff must prove to prevail on the laches defense to defendant's counterclaim); *Barclay's Bank of N. Y., N.A. v. Mkt. St. Mortgage Corp.,* 187 A.D.2d 141, 592 N.Y.S.2d 874, 877 (N.Y.A.D. 3 Dept.1993) (reviewing plaintiff's affirmative defense of laches included in the reply to defendant's counterclaim).

{40} Second, the Trust asserts that use of laches allowed the district court to avoid the undisputed facts mandating a finding that the Village has no water rights in the Spring and instead allowed it to create a water right in the Village by a form of prescription. As we have explained, this is not the import of the district court's order nor of our Opinion. We have decided the case on the basis of an enforceable contract right in the Village memorialized by the Contract and Indenture to

use Spring water. Laches was properly applied under undisputed facts to prevent the Trust from challenging the enforceability of the contractual obligation. The licensed water right remains in the Trust and the Berliers.

■ {41} Third, we see no theoretical reason why laches can only be asserted in defense. Laches is designed to prevent "litigation of a stale claim where the claim should have been brought at an earlier time and the delay has worked to the prejudice of the party resisting the claim." *Garcia*, 111 N.M. at 588, 808 P.2d at 38. The core of the doctrine is concern over staleness and prejudice. 2 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 419d (Spencer W. Symons ed., 5th ed.1941). The order in which parties appear on the caption should not carry the critical weight the Trust espouses.

{42} We recognize that laches is most frequently posed as an affirmative defense. However, where issues are joined by complaint and counterclaim there is no reason why a counter-defendant may not rely on laches as a means of avoiding all theories posed by the other party. This is particularly true where a claim is brought as a declaratory judgment action. It is frequently the case that a declaratory action is initially filed by the party one would normally expect to be the defendant. Here, for example, the Trust could have been the plaintiff seeking declaratory or injunctive relief identical to what it sought in its counterclaim. There is no doubt that the Village could have pled laches as a "defense" to such an action in its entirety.

■ {43} Finally, the very essence of equity is flexibility; the ability to accommodate circumstances as they arise. *In re Adoption of Francisco A.*, 116 N.M. 708, 713–14, 866 P.2d 1175, 1180–81 (Ct.App.1993).

### 3. The Floating Easement

■ {44} The Trust argues that the easement cannot be located on the ground based on the description in the Indenture and is therefore an invalid and unenforceable "floating" easement. The crux of the Trust's argument is that a valid conveyance of real property must describe the subject interest with particularity and if the conveyance fails to do so, it is a nullity. *See Komadina v. Edmondson*, 81 N.M. 467, 469, 468 P.2d 632, 634 (1970).

{45} The Trust concedes that the Contract and Indenture state the Village's intention of acquiring an easement over the Calley land for the purpose of constructing a new water works system. The Indenture provides:

(d) A perpetual right-of-way and easement over and across the following described land of [the Calleys], to wit: The East Half of Section 20; the Southwest Quarter of the Southwest Quarter of Section 21; the West Half and the Southeast Quarter of Section 28; and the North Half of the Northeast Quarter of Section 33; all in Township 21 North, Range 21 East, N.M.P.M .... as said works, water intake and pipe line may be located by the engineers of said Village ... and provided, further, that when the said rights-of-way have been definitely located by said engineers of said Village, said parties of the first part shall execute and deliver to said Village ... another deed, conveying to it said rights-of-way by said definite description, and thereupon the floating rights-of-way over and through said described land hereby conveyed shall become definitely located and merged in said definitely located and described rights-of-way so conveyed[.]

Sim Calley built the new pipeline for the Village within two years; however, a new deed, conveying the right-of-way by definite description, was never delivered by Calley to the Village.

{46} Thus, we have a clear intent by the parties to grant an easement, but the documents lack a specific description of the actual location of the easement.

{47} The issue is whether New Mexico will recognize the concept of a "floating" easement where the intent to grant an easement is clear, and the easement can be located on the ground as a result of construction and usage, yet the conveying document does not describe the easement such that it can be located from the description alone. Thus,

this case presents a different problem from that found in *Northrip v. Conner,* 107 N.M. 139, 142–43, 754 P.2d 516, 519–20 (1988), where the deed made no mention at all of any easement.

{48} The concept of a floating or blanket easement is well-accepted in the law. *Umberger v. State,* 248 N.W.2d 395, 397 (S.D. 1976); *Missouri Pub. Serv. Co. v. Argenbright,* 457 S.W.2d 777, 782–83 (Mo.1970); *City of Los Angeles v. Howard,* 244 Cal. App.2d 538, 53 Cal.Rptr. 274, 276 n. 1 (1966) ("A 'floating easement' . . . is an easement . . . which, when created, is not limited to any specific area on the servient tenement. . . .").

{49} Moreover, it is not unusual for a deed creating a floating easement to give the easement holder the right to later locate and fix the easement upon the ground. *Sorrell v. Tenn. Gas Transmission Co.,* 314 S.W.2d 193, 194 (Ky.1958) (holding that easement holder had the right to select routes for gas pipeline); *Smith v. King,* 27 Wash.App. 869, 620 P.2d 542, 543 (1980) (holding that easement holder had the right to select location of road).

{50} Further, if otherwise recognized, floating easements do not require a deed specifically delineating their location; they can be fixed by use. *Scherger v. N. Natural Gas Co.,* 575 N.W.2d 578, 580–81 (Minn.1998); *Flaherty v. DeHaven,* 302 Pa.Super. 412, 448 A.2d 1108, 1111 (1982) ("When the precise location of an expressed right-of-way is not fixed or defined by the deed, it is competent for the parties to define a location by subsequent agreement, use or acquiescence."); *Smith,* 620 P.2d at 543 (holding that the deed was not required to establish the actual location of the easement; an easement may be established by implication through customary use); *Matlock v. Humble Oil & Ref. Co.,* 284 S.W.2d 407, 411 (Tex.Civ.App.1955) (holding that the deed which did not specify the location of the road easement was adequate when thereafter the road was built by easement holder and acquiescence by other party followed).

{51} We see no conflict with prior case law or New Mexico policy in recognizing the validity of an undescribed, or "floating" ease-

ment in these circumstances. The intent of the Village and Calley is undisputed. The parties actually built and located the subject of the easement on the ground within a reasonable time after the Indenture was signed. There is little fear of adversely affecting the security of titles or the property rights of use and exclusion by recognizing floating easements limited to circumstances similar to those present in this case, and we hereby do so.

{52} Here, the Village's engineers laid out the new water line. It was constructed over sixty years ago by the landowner, and it was used thereafter without any objection from Calley, his successors-in-interest Clyde and Marie Berlier, and, until the present litigation, the Trust. Enforcing the water line easement does no violence to the agreement embodied in the Contract and Indenture or to the parties' expectation.

## The Trust v. The Berliers

### A. Procedural Posture

{53} On February 1, 1999, the Berliers moved to intervene seeking their own declaration of the respective water rights of the parties. In their complaint in intervention, the Berliers asserted that they owned 519.89 acres of the 655.44 acres of land appurtenant to Water Rights License No. 2682 in the Exchange Agreement. As a result, the Berliers argued that they owned the majority of the water rights flowing from the Spring. The Trust filed a counterclaim against the Berliers in which it claimed vested, pre–1907 water rights in the Spring separate from and in addition to the rights recognized by License No. 2682. The Trust also claimed exclusive rights in the ditches and reservoirs, slander of its title to water rights, and abandonment of water rights by the Berliers.

{54} On October 26, 2000, the district court granted summary judgment in favor of the Berliers and against the Trust. The court declared that Clyde Berlier's pre–1907 Declaration

was upon the same lands, same source of water, same distribution system as the License, granted to Clyde Berlier (the par-

ties' predecessor in interest) on August 8, 1956[,] and that there cannot be two water rights upon the same source of water, for the same appurtenant irrigated land and involving the same component distribution and reservoir storage system.

The court also declared that the Clyde Berlier Water Right under License No. 2682 is now owned by the parties as follows: "The Wagon Mound Ranch, L.L.C. [the Berliers] owns a water right for use of water from the Santa Clara Spring on 519.89 irrigated acres of land (being 79.31924 percent of the original Clyde Berlier Water Right under License No. 2682)" and that the "Mora Trust owns a water right of 135.55 irrigated acres of land (being 20.68076 percent of the original Clyde Berlier Water Right under License No. 2682)." (emphasis supplied). The court further declared that Wagon Mound Ranch, L.L.C. (the Berliers) owns an undivided 79.31924 percent interest and Mora Trust a 20.68076 percent interest as tenants in common

> in and to the component distribution system, including the diversion, storage reservoir, and ditches as an integral and necessary part of the distribution system to service [their] water rights, including easement rights, for the servicing of this conveyance system in connection with water rights in connection with the Santa Clara Spring.

{55} The Trust argues there are disputed issues of material fact regarding (1) whether Clyde Berlier had abandoned water rights to which the Trust claims title, (2) the percentages of the water rights owned by the Berliers and the Trust, (3) whether the Berliers slandered the Trust's title to its water rights, and (4) the Trust's counterclaim for ownership of 100% of the water rights flowing from the contract with the Village.

{56} The Berliers assert that the relevant documents in the record, namely Water Rights License No. 2682, Clyde and Marie Berlier's wills, the Exchange Agreement, and the deeds executed pursuant to the Exchange Agreement and by Marie Berlier individually, all demonstrate the absence of any issues of material fact. They assert that the documents are unambiguous, that the district court properly construed the documents, and, therefore, its grant of summary judgment should be affirmed.

## B. Standard of Review

{57} An award of summary judgment is proper only if there are no issues of material fact in dispute, and the movant is entitled to judgment as a matter of law. *Koenig*, 104 N.M. at 665–66, 726 P.2d at 342–43. In reviewing an appeal from a grant of summary judgment, the court must examine the whole record for evidence that puts a material fact in issue. *Gardner–Zemke Co. v. State*, 109 N.M. 729, 732, 790 P.2d 1010, 1013 (1990). The applicable standard of review of an appeal on summary judgment is de novo, and this Court need not defer to the trial court's analysis of the record and its conclusions of law. *C.R. Anthony Co. v. Loretto Mall Partners*, 112 N.M. 504, 510, 817 P.2d 238, 244 (1991).

## C. Discussion

{58} The record is clear on the following points. First, at the time of Clyde Berlier's death, there was only one ranch and one Santa Clara Spring and there is no evidence that water priorities were ever enforced within the ranch. Calley committed water to the Village. The Contract and Indenture reflects a mutual intent that the Village receive a reliable water supply. There is no evidence in the record that Calley reserved some earlier priority date as a means of denying water to the Village.

{59} Clyde Berlier filed a Declaration of pre–1907 water rights on all of his water rights asserting that they were of equal priority. He failed to pursue the pre–1907 Declaration, choosing instead to proceed with an application to appropriate. This process resulted in License No. 2682. Upon his death, Clyde Berlier devised his one-half community property share of the ranch's real property and water rights to his three children in undivided shares as tenants in common. The Exchange Agreement divided and reallocated the land and the water right, breaking the tenancy in common. After execution of the deeds implementing the Exchange Agreement and conveying Marie Berlier's one-half

community interest in the ranch land and water right, the Trust received title to 135.5 acres of irrigated land located west of Interstate 25.

{60} With these facts as a background we examine the Trust's specific arguments.

### 1. Did The Trust Raise a Material Issue of Fact About Pre–1907 Water Rights?

{61} The Trust holds title to 135.55 acres of land out of the 655.44 acres of irrigated land specified in Water License No. 2682. However, the Trust argues that it has the right to irrigate 240 acres of land using water from the Spring. The Trust disputes the Berliers' arguments that the only water rights at issue in this case derive from Water License No. 2682. The Trust also disputes that Clyde Berlier abandoned all other water rights in the Spring when he filed his Application for Permit and received License No. 2682. The Trust thus argues that the district court erred in denying them the opportunity to prove continuous, beneficial use of vested, pre–1907 rights for the additional 104.45 acres of land. Specifically, the Trust believes that the district court's determination that

Clyde Berlier's Declaration of Ownership of Water Right Perfected Prior to March 19, 1907, dated July 21, 1949, was upon the same lands, same source of water, same distribution system as the License, granted to Clyde Berlier on August 8, 1956 and that there cannot be two water rights upon the same source of water, for the same appurtenant irrigated land and involving the same component distribution and reservoir storage system

was in error.

{62} The Berliers argue that this case is the wrong setting in which to decide either the existence of additional water rights in the Spring or whether Clyde Berlier abandoned his pre–1907 rights when he accepted License No. 2682. The Berliers assert that such an inquiry is better made in a general water adjudication proceeding where all potential claimants are joined. However, as the Trust conceded at oral argument before us, we do not have to consider the broader legal question if the Trust failed to even create a question of fact as to the existence of pre–1907 rights in it.

{63} The Trust attempted to prove that Clyde Berlier acquired and always maintained a pre–1907 water right for the additional 104.45 acres through the research and testimony of Dr. Frances Levine. Based on census records, Dr. Levine could identify land located in "Precinct 12," which generally encompassed the land in question, and which she thought was irrigated prior to 1907. However, Dr. Levine could not testify whether the Trust or its predecessors owned land in "Precinct 12." As such, Dr. Levine could not opine whether the 104.45 acres the Trust claimed to be irrigating was land that had been irrigated prior to 1907, much less by whom. Dr. Levine conceded in her deposition that she did not have a specific description for the land included in "Precinct 12" and had no information on whether the 104.45 acres was ever continuously irrigated.

{64} On this record, it is clear that the Trust did not create a question of material fact as to its claim. The Trust could not demonstrate the location of the 104.45 acres; it could not provide evidence that this acreage had been continuously irrigated prior to 1907; and it could not provide evidence as to who did the irrigating pre–1907. Summary judgment was appropriate as to the Trust's claim to pre–1907 rights.

### 2. Did the District Court Err in Establishing the Percentages of the Water Rights and the Component Distribution System Owned by the Berliers and the Trust?

{65} Absent the pre–1907 rights question, the issue between the Trust and the Berliers becomes: What percentage of the water rights recognized in License No. 2682 (and the distribution system attached) do the parties own after the Exchange Agreement was put into effect? Based on the Trust's receipt of 135.55 acres of land of the total 655.44 acres detailed in License No. 2682, the district court calculated that the Trust owned 20.68076 percent of the licensed water rights in the Spring, and, conversely, that the Berliers owned 79.31924 percent of those rights. The Trust argues that the

court erred in reducing the parties' ownership to proportionate shares in this manner, asserting that the district court misconstrued the Exchange Agreement and accompanying deeds as conveying proportionate interests rather than all water rights appurtenant to specific tracts.

{66} The Trust admits that the rights permitted and licensed in License No. 2682 were appurtenant to specific tracts of land. However, they believe that transfer of those tracts would have carried appurtenant water rights, not in proportion to the number of acres, as found by the court, but by measurement of acre feet allotted to each tract in the permit and license. Thus, while the Trust concedes that it now owns 135.55 acres of land specifically identified in the License, along water rights appurtenant to that land, it argues that it owns more than 20.68076 percent of the water rights recognized by the License. The Trust seems to argue that the water rights it received are superior to those received by the Berliers because its tracts of land were somehow assigned more water in acre feet than those deeded to the Berliers. The record reveals no support for the Trust's claims.

{67} Clyde Berlier's Application for a Permit identified 655.44 acres of irrigated land and requested a permit to uniformly appropriate one and one-half (1½) acre feet of water per acre of land per year, plus certain storage rights. The Application did not allocate more acre feet to some acreage than others. License No. 2682 follows the same pattern. It grants a permit to use one and one-half (1½) acre feet per year on 655.44 acres on a uniform basis. Thus, there is no indication in the License that the Trust's acreage was allocated more water than the Berliers' acreage.

{68} The Exchange Agreement divided the real property along with appurtenant water rights. The conveyance to the Trust included "the Water Rights set forth in Declarations 099 and 0118 filed with the State Engineers Office on August 8, 1956, as appurtenant to [conveyed] Tracts 2 and 3 for irrigation, domestic and livestock purposes." The conveyance to the Berliers included "the Water Rights set forth in Declarations 099

and 0118 filed with the State Engineers Office on August 8, 1956, as to the above described [conveyed] lands, appurtenant for irrigation, domestic and livestock purposes." (Emphasis supplied.) The deeds issued by the estate of Clyde Berlier followed suit, as did Marie Berlier's Last Will and Testament conveying her one-half of the community property.

{69} The clear intent of these provisions is that the Trust and the Berliers received the water rights appurtenant to the land they received. The water rights were uniformly permitted at one and one-half acre feet of water per acre of land. The necessary conclusion is that the right recognized in License No. 2682 is now owned in percentages proportionate to the division of the land identified in the License. The Trust did not raise a material question of fact requiring a trial on this issue.

{70} The Exchange Agreement addressed the Spring's component water distribution system as well. In both the Personal Representative's Quitclaim Deed for Clyde Berlier's Estate and the Exchange Agreement, Tracts 2 and 3 are conveyed to the Trust specifically subject to

> Easements and all water rights to the Water and Water Rights of Santa Clara Springs, and for ditches and access, for one-half (½) the Water Rights set forth in Declarations 099 and 0118 filed with the State Engineers Office on August 8, 1956, as such rights are appurtenant to the following described lands [Tracts 4 and 5 conveyed to the Berliers and their Wagon Mound Ranch, L.L.C.].

Furthermore, the Exchange Agreement provided the Berliers with a

> perpetual easement over and across Sections 20, 21, 27, 28 and 29, T21N, R21E, for ditches, pipelines and distribution of water, and for ingress, egress and access to the springs and water source in said sections for maintenance, utilities, distribution and operation of the water rights and water hereinabove conveyed.

{71} Nowhere do the deeds or the Exchange Agreement purport to convey or reserve a direct ownership or fee interest in

the Berliers in the distribution system. The only references are to easements incident to the right to ensure access to the water. To the extent the district court order granting summary judgment purports to grant the Berliers an interest greater than an easement in the distribution components located on Trust land, it is in error and must be reversed. We will not attempt to otherwise clarify the nature or extent of the Berliers' interest. Rather we remand to the district court for further proceedings as may be requested by the parties.

{72} The Trust argues there are questions of fact concerning the Berliers' abandonment of a portion of the water rights appurtenant to their 519.89 acres, and that this affects the percentage of water rights owned by the parties. We are not certain that abandonment is a proper subject of litigation between sharers of a license granted by the State Engineer. It appears that abandonment is primarily a subject which the State Engineer should pursue under NMSA 1978, § 72–4–15 (1929). Moreover, even if abandonment was proven, the lost right would not revert to the Trust; it would return to the public at large. *See* § 72–1–1 and NMSA 1978, § 72–5–28 (1907).

{73} Assuming, for purposes of argument, that abandonment was a proper subject of this litigation, we hold that the Trust did not raise any question of material fact requiring trial. Its sole showing was an assertion of non-irrigation of some portion of the Berliers land for an undetermined length of time. Mere non-use with no indication of the reason for non-use is not sufficient to create a question of fact. *State ex rel. Reynolds v. S. Springs Co.*, 80 N.M. 144, 146, 452 P.2d 478, 480 (1969). Intent to abandon is a required element under the doctrine of abandonment of water rights. *Id.* We find no evidence of such intent in the record. In addition, there is no evidence that the State Engineer has issued a notice of forfeiture as is now required. *See* § 72–5–28.

### 3. Slander of The Trust's Title

{74} The Trust argues that the Berliers slandered its title to water when they recorded their Change of Ownership of Water Rights form in February 1992. Section 72–1–2.1 requires the new owner of a water right to file a Change of Ownership form with the State Engineer. Once the Berliers became the new owners of water rights as set forth in the Exchange Agreement and related deeds, they were required to file a Change of Ownership form. Slander of title occurs when one who, without the privilege to do so, willfully records or publishes matter "which is untrue and disparaging to another's property rights in land as would lead a reasonable man to foresee that the conduct of a third purchaser might be determined thereby." *Den–G.A.R. Enters. v. Romero*, 94 N.M. 425, 430, 611 P.2d 1119, 1124 (Ct.App. 1980). The Trust complains that slander occurred by the filing of the form with reference to proportional interests in water rights in the Spring where the parties to the Exchange Agreement had not agreed to such language. We disagree. The Change of Ownership reflects the Berliers ownership of 519.89 acres of the 655.44 acres of land appurtenant to Water Rights License No. 2682, which is the same proportion of ownership we upheld in a previous portion of this opinion. Consequently, the information contained in the Change of Ownership form is correct and there is no "published matter which is untrue and disparaging" to the Trusts's rights. Summary judgment was properly entered on this claim.

### D. Does the Trust Own 100% of the Water Rights Flowing From the Contract and Indenture with the Village?

{75} Under the Exchange Agreement, the real property and appurtenant water rights received by the Trust were subject to, among other burdens, "[t]he water contract and easements appurtenant thereto with the Village of Wagon Mound recorded in Mora County Deed Volume 06 at page 238 thereof." The Trust's property is the only property subject to the Indenture. The Trust notes that while the Exchange Agreement clearly burdens the Trust's property with delivery of water to the Village, it does not mention whether the benefits from the Contract and Indenture should flow to the Trust. The Trust filed a counterclaim alleging that it was entitled to all of the benefits flowing from the Contract and Indenture.

{76} The import of this burden on the Trust's title is unclear. The Trust argues and makes a reasonable showing that it can demonstrate through extrinsic evidence that the parties intended the Trust to receive any benefits flowing from the Contract and Indenture. Summary judgment was improper on this claim given the lack of clarity and meaning of the provisions. We reverse the district court as to this issue and remand for further proceedings.

## CONCLUSION

{77} The order of the district court granting summary judgment to the Village is affirmed except to the extent—as explained above—that it may purport to recognize a water right, as such, in the Village flowing from the Contract and Indenture.

{78} The order of the district court granting summary judgment to the Berliers is affirmed except with regard to the issues of the ownership of the distribution system and the benefits flowing from the Contract and Indenture. As to these two issues, the district court order in favor of the Berliers is reversed and remanded.

{79} **IT IS SO ORDERED.**

WE CONCUR: CELIA FOY CASTILLO and IRA ROBINSON, JJ.